SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Evan Reece** (A-79/80-13) (073284)

**Argued April 14, 2015 -- Decided July 20, 2015**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the police officers' entry into defendant's home without a warrant was justified under the emergency-aid doctrine, and whether the requisite elements for obstruction of the administration of law under N.J.S.A. 2C:29-1(a) were established by the evidence.

The police arrived at defendant's home to investigate a dropped 9-1-1 call that originated there.  In response to questions from Sergeant Delagarza, defendant denied making any such call, and insisted that he was alone in the home, although Delagarza had observed three vehicles in the driveway.  Defendant retrieved and displayed his cordless home phone to Delagarza, which did not show any call to 9-1-1 in its memory.  Delagarza looked into the house through the front door that defendant had left open, and saw nothing unusual or suspicious. Nevertheless, Delagarza called for a backup, and with defendant present, confirmed with the police dispatcher that the originating number of the call was defendant's home phone number.  During these communications, Delagarza noticed a small abrasion on the knuckle of defendant's hand, which Delagarza stated was similar to the result of punching something.  Delagarza asked defendant if he was married, and defendant stated that he was, further stating that his marital status was none of Delagarza's business.  Delagarza noticed that defendant's demeanor began to change at this point, and he became frustrated with Delagarza's presence and his questioning.  Delagarza asked if he could enter the house and look around, but defendant refused consent.  Delagarza then called for assistance and told defendant that he and the other officers needed to check the house.  Defendant responded by slamming the door closed and attempting to lock it, while the officers pushed the door open.  Delagarza announced that defendant was under arrest, and the officers entered defendant's residence.  Defendant attempted to block their entry, and a struggle ensued.  After being subdued, defendant was arrested and charged with two counts of simple assault under N.J.S.A. 2C:12-1(a)(1), one count of resisting arrest under N.J.S.A. 2C:29-2(a), and one count of obstructing the administration of law under N.J.S.A. 2C:29-1(a).

Defendant's trial proceeded in municipal court.  At the conclusion of the trial, the judge held that, under the emergency-aid doctrine, the officers were entitled to enter defendant's home without a warrant.  Based on this finding, the court held that defendant's attempt to deny them access constituted obstruction.  The court also made specific credibility findings.  Defendant was found guilty of one count of simple assault, resisting arrest, and obstruction.  Defendant was acquitted of the other count of simple assault.  On appeal to the Law Division, defendant was found guilty of resisting arrest and obstruction, and not guilty of simple assault.

In a split decision, the Appellate Division affirmed defendant's conviction for resisting arrest, and reversed the conviction for obstruction, a majority of the panel finding that the emergency-aid doctrine did not apply.  A dissenting member of the panel disagreed with the majority's affirmance of defendant's conviction for resisting arrest.

Defendant appealed as of right to this Court under Rule 2:2-1(a) based on the dissent in the Appellate Division.  The Court granted the State's petition for certification on the dismissal of the obstruction charge.  217 N.J. 296 (2014).

**HELD:**  The emergency-aid doctrine justified the officers' warrantless entry into defendant's home.  Based thereon, defendant's conviction for resisting arrest is affirmed, and defendant's conviction for obstruction is reinstated.

1. An appellate court must defer to the factual findings of the trial court, provided they are based on sufficient credible evidence in the record.  Appellate review of the factual and credibility findings of the municipal court and

1

the Law Division is therefore exceedingly narrow because such findings are substantially influenced by the opportunity to observe witnesses and obtain the feel of a case, which a court reviewing the matter cannot do. Similar deference is not required for the court's legal determinations. (pp. 14-16).

2. As a general rule, police officers must obtain a warrant before searching a person's property, unless the State satisfies its burden of proving that a warrantless search was justified by established and well-delineated exceptions to the warrant requirement. Here, the State relied upon the emergency-aid doctrine, as described in State v. Frankel, 179 N.J. 586, cert. denied, 543 U.S. 876 (2004). The emergency-aid exception is derived from the commonsense understanding that exigent circumstances may require public safety officials to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury. In determining whether the emergency-aid doctrine justifies a warrantless search, the court applies the objective reasonableness test. The State must therefore satisfy a two-prong test by establishing that the officer had an objectively reasonable basis to believe that an emergency exists, requiring that he provide immediate assistance to protect or preserve life, or prevent serious injury, and there was a reasonable connection between the emergency and the area to be searched. (pp. 16-18).

3. A dropped 9-1-1 call from a residence has been recognized as creating a presumptive emergency requiring an immediate response, although the presumption created is a rebuttable one. Therefore, the emergency-aid exception presents a fact-sensitive inquiry in which a court must weigh the competing interests at stake, more particularly, the privacy interests of an individual in the home, against the interest in acting promptly to render potentially life-saving assistance to a person who may be incapacitated. (p. 19).

4. The facts of this matter provided an objectively reasonable basis for Delagarza to believe that an emergency existed requiring immediate assistance, based on the dropped 9-1-1 call and the presumption of an emergency thereby created, and his observations that: defendant denied making the call while also claiming that no one else was home; there were three cars in the driveway; there was an abrasion on defendant's hand; and defendant became agitated when asked if he was married. As a result, the emergency-aid exception justified the officers' warrantless intrusion into defendant's home. (pp. 19-22).

5. The offense of obstructing the administration of law under N.J.S.A. 2C:29-1(a), in prohibiting conduct that prevents or attempts to prevent a public servant from lawfully performing an official function, has been construed to mean action by a police officer in objective good faith, under color of law, in the execution of his duties. A suspect is therefore required to cooperate with the investigating officer even when the legal underpinning of the police-citizen encounter is questionable, because the validity of the underlying police action is inconsequential under the statute. When Delagarza announced his intention to enter the house, he was doing so to lawfully perform an official function. Because the emergency-aid doctrine applied and justified the warrantless intrusion into defendant's home, defendant's conduct in hampering their entry into his home constitutes obstruction. Defendant's conviction for obstruction should have been upheld. (pp. 22-24).

6. Under N.J.S.A. 2C:29-2(a)(3), it is not a defense to a prosecution for resisting arrest that the law enforcement officer was acting unlawfully in making the arrest, provided he was acting under color of his official authority and that he announces his intention to arrest the defendant prior to defendant's resistance. Additionally, a defendant does not have the right to respond to such conduct by resisting arrest or obstructing the police. In this case, because defendant pulled his hands away from the officers after it was announced that he was under arrest and dragged the officers to the floor, defendant's conviction for resisting arrest was properly affirmed. (pp. 24-25).

7. Defendant's claim of excessive force as a defense to the charges of obstruction and resisting arrest lacks merit. Defendant's failure to yield to the officers' legitimate authority, and the altercation that resulted, allowed the officers to use the force that the municipal court and Law Division found necessary to subdue defendant. (pp. 25-26).

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**. Defendant's conviction for resisting arrest is **AFFIRMED**, and defendant's conviction for obstruction is **REINSTATED**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.**

STATE OF NEW JERSEY,

     Plaintiff-Respondent
     and Cross-Appellant,

        v.

EVAN REECE,

     Defendant-Appellant
     and Cross-Respondent.

> Argued April 14, 2015 – Decided July 20, 2015
>
> On appeal from and certification to the
> Superior Court, Appellate Division.
>
> Justin T. Loughry argued the cause for
> appellant and cross-respondent (Loughry and
> Lindsay, attorneys).
>
> Daniel I. Bornstein, Deputy Attorney
> General, argued the cause for respondent and
> cross-appellant (John J. Hoffman, Acting
> Attorney General of New Jersey, attorney).

JUSTICE SOLOMON delivered the opinion of the Court.

Officers responded to defendant's home to investigate a dropped 9-1-1 call. When the officers announced their intention to enter defendant's home without a warrant, defendant attempted to block their entry and a struggle ensued. After being subdued, defendant was arrested and charged with two counts of simple assault, N.J.S.A. 2C:12-1(a)(1); one count of resisting

arrest, N.J.S.A. 2C:29-2(a); and one count of obstruction, N.J.S.A. 2C:29-1(a).

Following trial, the municipal court judge found defendant guilty of one count each of simple assault, resisting arrest, and obstruction. Defendant appealed de novo to the Superior Court, Law Division. The Law Division found defendant guilty of resisting arrest and obstruction, but not guilty of simple assault. A divided Appellate Division panel affirmed defendant's conviction for resisting arrest, and reversed defendant's conviction for obstruction.

In this appeal, we are called upon to resolve two issues: first, whether the officers' warrantless entry into defendant's home was justified under the emergency-aid doctrine; and second, whether the elements of obstruction were established by the evidence presented. We conclude that the emergency-aid doctrine justified the officers' warrantless entry into defendant's home. Furthermore, because the credibility and factual findings of the municipal court and Law Division were supported by substantial evidence, we affirm defendant's conviction for resisting arrest and reinstate defendant's obstruction conviction.

I.

The State presented the following proofs at trial. At dusk on January 7, 2009, Pemberton Police Department Sergeant Peter

Delagarza responded to a dropped 9-1-1 call originating from defendant's home.[1]  Upon arrival, Delagarza, who was in uniform, walked around the property and observed three vehicles in the driveway.  Moments later, Delagarza knocked on the front door.  Defendant opened the door, and Delagarza asked if defendant made a 9-1-1 call.  Defendant denied making any such call and, when asked, insisted that that he was alone in the home.

In an effort to show that no call had been made, defendant asked if he could retrieve his cordless home phone to show Delagarza.  Delagarza assented, and defendant walked back into the residence, leaving the front door ajar.  Delagarza peered into the home through the open door but saw nothing unusual or suspicious.  Nevertheless, Delagarza radioed for backup.

When defendant returned with the phone, he displayed the phone's screen to Delagarza and scrolled through the caller identification.  Finding no 9-1-1 call in the phone's memory, defendant handed the phone to Delagarza, who then radioed dispatch to confirm that the 9-1-1 call originated from defendant's residence.  Defendant stood next to Delagarza as the dispatcher repeated the originating number of the call, which defendant confirmed was his home phone number.

---

[1] A dropped 9-1-1 call is an emergency call received by the communication center of a law enforcement agency from an identified location where the caller disconnects before information can be received.

During this exchange, Delagarza noticed that defendant had a small abrasion on his right hand. At trial, Delagarza testified on direct examination that the abrasion was "somewhere around the knuckle area of the hand," and similar to "an abrasion that you would receive from punching something." After noticing the abrasion, Delagarza asked defendant whether he was married. According to Delagarza, defendant responded, "I don't see what business it is of yours anyway, but I'm married." Delagarza testified that after he asked this question defendant's demeanor began to change, and "it seemed like he was starting to get frustrated with the fact that I was there and that I was starting to ask these questions."

Delagarza then asked if he could enter the house and look around, but defendant refused consent. Delagarza called for assistance. Officers Hall and Gant, who had responded to Delagarza's call for backup and were seated in marked cars parked in front of the house, joined Delagarza at the doorway. Delagarza told defendant that he and the officers needed to check the house, at which point defendant slammed the door closed. While defendant attempted to lock the door, the officers pushed the door open. Delagarza announced that defendant was under arrest, and the officers entered defendant's residence.

4

Delagarza testified that, when he moved to place the defendant under arrest, defendant "immediately started to physically resist" by pulling his hand away.  At this point, Officers Hall and Gant also "grabbed" defendant and all four men "immediately . . . fell to the ground on the floor."  During the struggle on the floor, Delagarza was pinned beneath defendant, causing Officers Hall and Gant to fear for Delagarza's safety.  Hall and Gant each reacted by striking defendant once in the face with a closed fist.  After securing defendant, Delagarza and Gant checked the interior of the house and found nothing amiss.

Defendant disputes the State's factual assertions in four significant respects.  First, he said the officers did not announce their intention to arrest him.[2]  Second, he claims he did not resist arrest by pulling his hands away from the officers.  Rather, after the officers grabbed him he executed a "controlled fall" similar to a maneuver learned in parachute training[3] by simply "let[ting] [his] legs go" because he feared "get[ting] hurt otherwise," and as a result of this controlled

---

[2] The trial transcript reveals that, upon entering the home, Hall and Gant heard the announcement that defendant was under arrest. Delagarza testified that he made the statement, and Gant identified Delagarza as the one who did so.  However, Hall could not recall which officer made the announcement.

[3] Defendant was a Captain in the United States Air Force.

fall, he and the three officers tumbled to the floor.  Third, defendant stated that Delagarza mischaracterized the abrasion on his hand.  Finally, defendant asserted the officers did not limit themselves to one blow each, rather they struck defendant "in volleys of two to three, probably three to four total times."

After the incident, defendant was charged with resisting arrest, N.J.S.A. 2C:29-2(a); obstructing the administration of law, N.J.S.A. 2C:29-1(a); and simple assault upon Delagarza and Hall, N.J.S.A. 2C:12-1(a)(1).  Trial occurred in Pemberton municipal court on four separate dates between June 14, 2010, and March 14, 2011.[4]

At the conclusion of the trial, the municipal court judge made specific credibility findings.  The judge found defendant "less than credible" because the judge "found [defendant] to be a bit too glib, to have too many ready explanations for obvious[ly] inappropriate behavior."  The judge supported that conclusion by noting several instances where defendant's credibility was undermined by attempts to craft an explanation for his conduct.

For example, defendant asserted that when the incident first began, he questioned whether Delagarza was indeed a police

---

[4] The procedures used by the municipal court are not challenged in this appeal.

6

officer, despite Delagarza's conspicuous uniform and badge. Defendant testified that he suspected Delagarza was not an officer because defendant was alone in the home and had not placed the 9-1-1 call. However, during direct examination, defendant suggested that the dropped 9-1-1 call may have occurred as the result of a phone malfunction caused by the inclement weather. Finally, the judge characterized defendant's purported "controlled fall" as a "convenient explanation."

The municipal court judge found that defendant further undermined his credibility by giving a lengthy and detailed explanation of what he was wearing during the incident, and why he had chosen to wear each article of clothing. In the judge's opinion, this testimony was an attempt to explain away inappropriate conduct -- defendant contended that the wool socks he was wearing caused him to slide and lose his footing on the freshly polished hardwood floors.

By contrast, while acknowledging minor discrepancies in the officers' testimony, the judge found the officers credible. The judge reasoned that, although the officers were sequestered during trial and were thus incapable of hearing each other's testimony, the officers' accounts were "very similar." He characterized the testimony of Delagarza and Hall as "good, open, honest, and credible," because both officers limited their testimony to "that which they had seen and recalled from the

7

incident." The judge specifically credited Delagarza's explanation that he did not report that Hall and Gant struck defendant because Delagarza was underneath defendant and did not see it happen. The judge also credited Hall's statement that he punched defendant once out of concern for Delagarza's safety, and Gant's testimony that he struck defendant in the face to end the encounter quickly after sensing Delagarza was on the floor underneath defendant.

Ultimately, the municipal court made the following findings: (1) the officers announced their intention to arrest, (2) defendant was aware that the officers were in fact police officers, and (3) Officers Hall and Gant each punched the defendant once in the face because they perceived a threat to Delagarza. The judge then found defendant guilty of simple assault upon Officer Hall, resisting arrest, and obstruction, but acquitted defendant of simple assault upon Delagarza.

In finding defendant guilty of resisting arrest, the judge stated:

> I think it is clear that the testimony presented indicated that [defendant] was advised that he was under arrest on more than one occasion . . . . [I]t is abundantly clear to anyone and certainly to [defendant] that if you're being told to stop resisting, that you should in fact stop resisting and allow yourself to be placed under arrest.

The judge also held that the officers were entitled to enter the home based upon the emergency-aid doctrine, as described in State v. Frankel, 179 N.J. 586, cert. denied., 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004). The judge reasoned that, because the officers "had the right to enter the home," defendant's attempt to deny them entry constituted obstruction of justice.

On de novo review, the Law Division affirmed defendant's convictions for resisting arrest and obstruction. The Law Division held that, "upon these facts, [Delagarza] and his colleagues were justified in doing what was needed to insure that no one in that house was in need of emergent aid. They had the duty to enter to confirm or dispel an emergency situation." The Law Division added that defendant's testimony did not appear credible.

> [I]f [defendant] had "gone limp" or "did nothing" as he suggests, the whole matter would have been completed within a very short period as opposed to a several minute physical struggle on the floor with defendant's face being struck and bruised. The testimony of the defendant is simply not worthy of belief.

Additionally, the Law Division determined that "defendant, by all the circumstances presented to him, knew that Delagarza and his officers were police and why they were there at his door."

The Appellate Division, in a split decision, affirmed defendant's resisting arrest conviction but reversed defendant's

9

conviction for obstruction.  Judge Alvarez, writing for the majority, found that the emergency-aid doctrine did not apply because Delagarza "simply lacked sufficient information from which to conclude someone in the home was at risk of immediate danger."  Judge Alvarez explained

> [i]n the absence of facts triggering the emergency aid doctrine, which would make police entry lawful, defendant's refusal to allow Delagarza to enter his home was not an act of obstructing.  He was entitled to refuse to cooperate.  We do not suggest, however, that Delagarza's concern was unwarranted, only that the circumstances did not justify a forced entry.  If the entry was unlawful, defendant's conduct in refusing to admit the officers is not an act of "obstructing."

Regarding the resisting arrest conviction, the majority, quoting N.J.S.A. 2C:29-2(a), held that because the arrest was made under "color of . . . official authority" and was announced, defendant was not entitled to resist arrest, even if the arrest was unjustified.

In a concurring opinion, Judge Waugh concluded that, "although the police officers had lawful reason to enter [defendant]'s residence without a warrant or consent, [defendant]'s refusal of their request that he consent to a warrantless search was not a violation of [the obstruction statute]."

Judge Fisher, dissenting in part, disagreed with the majority's affirmance of defendant's conviction for resisting

10

arrest. In Judge Fisher's view, his colleagues' conclusion "oversimplifie[d] the troubling issues raised by th[e] case, namely, the clear disregard of defendant's Fourth Amendment rights." The dissent added that "[i]t is the fact that this event occurred in the home and not elsewhere that prompts my dissent," asserting that defendant was not guilty of resisting arrest because the unlawful intrusion into defendant's home and the officers' use of excessive force permitted defendant to protect himself.

The dissent disagreed with the Law Division's factual findings, asserting that those findings should have been rejected because the Law Division failed to consider the discrepancy between Delagarza's testimony that he saw an abrasion on defendant's knuckle and the photographs admitted into evidence which showed an abrasion at the base of his thumb. The dissent also rejected the factual findings of the municipal court and the Law Division because they did not consider that Delagarza's police report made no mention of the other officers striking defendant in the face. Thus, the dissent posited, the Law Division's findings were "so plainly unwarranted that the interests of justice demand intervention and correction."

Defendant appealed his conviction as of right. R. 2:2-1(a). Subsequently, this Court granted the State's petition for

11

certification regarding the dismissal of the obstruction charge. State v. Reece, 217 N.J. 296 (2014).

                                II.

Defendant argues that, to obtain a conviction for resisting arrest, the State must show that the arresting officers announced their intention to arrest prior to any resistance, the officers were acting under color of their authority, and the "police [did] not use unlawful force in effecting the unlawful arrest." N.J.S.A. 2C:29-2(a); N.J.S.A. 2C:3-4(b)(1)(a); State v. Mulvihill, 57 N.J. 151, 157-58 (1970). Defendant contends that the officers failed to announce their intentions to arrest prior to defendant's resistance and used excessive force in restraining him. Thus, defendant argues, the majority erred in affirming his resisting arrest conviction.

Defendant maintains that, in this case, the police used unlawful force by "physically set[ting] upon [defendant] with overpowering force when he never so much as attempted a punch, kick or push." Defendant argues that the Appellate Division majority, when considering the resisting-arrest charge, ignored the officers' unlawful force. Defendant also maintains that, given the reversal of his obstruction conviction, the Appellate Division impliedly concluded that "the police entered forcibly and illegally, without any justification," and the officers' "very presence inside the house and the measures by which they

                                12

accomplished that presence were unlawful and constituted in and of themselves unlawful force."

Defendant emphasizes that, contrary to State v. Williams, 192 N.J. 1 (2007), and State v. Crawley, 187 N.J. 440, cert. denied, 549 U.S. 1078, 127 S. Ct. 740, 166 L. Ed. 2d 563 (2006), both of which dealt with police-citizen encounters on the street, the police in this case unconstitutionally invaded his home. He urges this Court to consider the resisting arrest charge "in the context of this sacrosanct constitutional right of privacy and security and right to be left alone in the home, free of official intrusion."

Defendant asserts that the majority failed to reverse the resisting arrest conviction based on plainly unwarranted, unsupported factual findings and credibility determinations. Specifically, defendant maintains as follows: Delagarza's testimony that he saw an abrasion on defendant's knuckle was "conclusively refuted" by photographs; Delagarza lacked candor because his report made no mention that defendant was punched in the face; and Hall testified he did not hear Delagarza say defendant was under arrest, which supports defendant's claim that the officers did not announce defendant was under arrest. Finally, defendant asserts that "[t]he record does not permit a rational conclusion of guilt beyond a reasonable doubt for 'resistance' to an unlawful arrest."

13

The State argues that the officers' entry into the home was justified by the emergency-aid doctrine because a dropped 9-1-1 call had been made from defendant's residence, defendant denied making the 9-1-1 call but claimed no one else was home, Delagarza observed a fresh abrasion on defendant's hand, and defendant became suspiciously defensive and hostile when asked if he was married. The State asserts that the facts here are "materially indistinguishable" from Frankel, and therefore the result should be the same. Additionally, the State argues that, under Crawley, regardless of the constitutionality of the officers' decision to enter defendant's residence under the emergency-aid doctrine, defendant "still had no right to physically resist their efforts to enter the house, and when he did so, he was guilty of obstruction."

### III.

We begin our review with the well-settled proposition that appellate courts should give deference to the factual findings of the trial court. State v. Locurto, 157 N.J. 463, 470-71 (1999). Those findings must be upheld, provided they "'could reasonably have been reached on sufficient credible evidence present in the record.'" Id. at 471 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). Deference is warranted because the "'findings of the trial judge . . . are substantially influenced by his opportunity to hear and see the witnesses and to have the

14

"feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting Johnson, supra, 42 N.J. at 161).

In Locurto, the defendant appealed a municipal court conviction to the Law Division. Id. at 467. As with the instant case, the Law Division's factual findings in Locurto were predicated upon the credibility findings of the municipal court, and we noted that

> the rule of deference is more compelling where . . . two lower courts have entered concurrent judgments on purely factual issues. Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error.
>
> [Id. at 474.]

Therefore, appellate review of the factual and credibility findings of the municipal court and the Law Division "is exceedingly narrow." Id. at 470.

However, to the extent the Law Division or municipal court makes a legal determination, that determination is reviewed de novo. See State v. Handy, 206 N.J. 39, 45 (2011) (stating "appellate review of legal determinations is plenary"). Thus, we must defer to the factual findings of the municipal court and the Law Division so long as they are supported by sufficient

15

credible evidence, but we review the legal conclusion that the emergency-aid doctrine applies here de novo.

IV.

A.

With those standards in mind, we must first consider whether warrantless entry of defendant's home was justified by the emergency-aid doctrine.

Article I, Section 7 of the New Jersey Constitution assures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause . . . ." Thus, as a general matter, "police officers must obtain a warrant from a neutral judicial officer before searching a person's property." State v. Deluca, 168 N.J. 626, 631 (2001).

In recognition of our strong policy against warrantless searches and seizures, the burden falls upon the State to prove a warrantless search was justified by one of the "'specifically established and well-delineated exceptions'" to the warrant requirement. Frankel, supra, 179 N.J. at 598 (quoting Mincey v. Arizona, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 290, 298-99 (1978)). Therefore, police officers are entitled to conduct a warrantless search when the search is supported by "a

16

known exception to the warrant requirement." State v. Eckel, 185 N.J. 523, 539 (2006).

The exception to the warrant requirement at issue here is the emergency aid doctrine, an exception "derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." Frankel, supra, 179 N.J. at 598. Under those circumstances, our constitution does not "demand that public safety officials stand by in the face of an imminent danger and delay potential lifesaving measures while critical and precious time is expended obtaining a warrant." Id. at 599.

In determining whether the emergency-aid doctrine justifies a warrantless search, we follow federal jurisprudence and apply "the objective reasonableness test." Kevin G. Byrnes, Current N.J. Arrest, Search & Seizure, § 11:2, at 226 (2014-15). In Frankel, supra, we adopted a "three-prong test to determine whether a warrantless search by a public safety official is justified." 179 N.J. at 600. Under Frankel,

> the public safety officer must have an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or prevent serious injury; his primary motivation for entry into the home must be to render assistance, not to find and seize

17

evidence; and there must be a reasonable nexus between the emergency and the area or places to be searched.

[Ibid.]

In State v. Edmonds, 211 N.J. 117, 132 (2012), we revisited the test articulated in Frankel and concluded that the subjective motivations of a public safety official were "no longer consonant with Fourth Amendment jurisprudence." Id. at 131-32. Consequently, Edmonds framed a two-part test to be applied in determining whether the emergency-aid doctrine justifies a warrantless search:

1) the officer had 'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury' and

2) there was a 'reasonable nexus between the emergency and the area or places to be searched.'

[Ibid. (quoting Frankel, supra, 179 N.J. at 600.]

In this case, the nexus between the perceived emergency and the scope of the officers' search is not challenged. Therefore, the issue here concerns only the first prong of the analysis.

In Frankel, supra, we explained that the first prong asks "whether [the officer] was 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[s]' his entry into

18

defendant's home under the emergency aid doctrine." 179 N.J. at 610 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)). Applying that principle, we held that a dropped 9-1-1 call from a residence creates "a presumptive emergency, requiring an immediate response," because such a call suggests "a person whose life is endangered but [is] unable to speak" made the call. Id. at 604.

However, the presumption that an emergency exists when there is a dropped 9-1-1 call "may be dispelled by any number of simple explanations given by the homeowner to the responding officer." Ibid. For instance, a parent "may explain that her child, who appears at the door with her, impishly dialed the number"; or "[a] resident, who otherwise raises no suspicions, may state that he intended to call 4-1-1 but pushed the wrong digit." Id. at 604-05. Courts applying this presumptive emergency "must weigh the competing values at stake, the privacy interests of the home versus the interest in acting promptly to render potentially life-saving assistance to a person who may be incapacitated." Id. at 605. This is a fact-sensitive inquiry. Id. at 606.

The facts in Frankel inform our inquiry here. In Frankel, a police officer responded to a dropped 9-1-1 call originating from the home of the defendant. Id. at 593. The officer knocked on the front door, and the defendant answered, but the

officer could not see into the home because his view was obscured by a white sheet hanging behind the front door. Ibid. The defendant denied placing a 9-1-1 call and claimed that he was alone in the home. Id. at 593-94. The officer, noting the defendant's increasing nervousness, began to fear for his safety and asked the defendant to come out from behind the sheet. Id. at 594. Once the defendant complied, the officer frisked him for weapons. Ibid. The officer then asked for permission to enter the home. Ibid. However, because the officer did not have a warrant, the defendant refused entry. Ibid. The officer then called for backup. Ibid.

The officer and the defendant continued their conversation on the porch. Ibid. The officer confirmed with the police dispatcher that the 9-1-1 call originated from the defendant's phone, and a follow-up call to that number elicited a busy signal. Id. at 594-95. While the defendant retrieved his cordless phone, the officer entered the foyer with the defendant's consent and noticed a lawn chair propped against a sliding glass door which he believed may have been intended to impede entry. Id. at 594-95. When backup arrived, the officer entered the home and conducted a search limited to places where a body could be concealed. Ibid. No one else was found, but the search revealed marijuana plants, ultraviolet lights and an elaborate watering system. Id. at 596. The defendant was

20

charged with fourth-degree possession of marijuana, N.J.S.A. 2C:35-10a (3), and first-degree operation of a marijuana manufacturing facility, N.J.S.A. 2C:35-4.  Id. at 596.

On those facts, we held that the totality of the circumstances justified the officer's warrantless search under the emergency-aid doctrine because the dropped 9-1-1 call created "a duty to presume there was an emergency."  Id. at 609. Moreover, the defendant's nervous demeanor and the dispatcher's confirmation that the 9-1-1 call came from the defendant's phone reinforced the officer's suspicion that there was an incapacitated person in the home.  Ibid.

Similarly, the dropped 9-1-1 call in this case permitted Delagarza to presume that there was an emergency.  In light of that presumption, and based upon his observations -- defendant denied making the 9-1-1 call while also claiming no one else was home, there were three cars in the driveway, there was an abrasion on defendant's hand, and defendant became agitated when asked if he was married -- Delagarza had "an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury."  Frankel, supra, 179 N.J. at 600.

The facts presented here are strikingly similar to those present in Frankel.  Accordingly, we conclude that the emergency-aid exception to the warrant requirement justified the

21

police officers' intrusion into defendant's home.  Having determined that the officers' warrantless entry was justified under the emergency-aid doctrine, we now turn to the specific charges against defendant.

B.

1.

A person is guilty of obstructing the administration of law or other governmental function when he or she

> purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.
>
> [N.J.S.A. 2C:29-1(a) (emphasis added).]

We have "construe[d] 'lawfully performing an official function' to mean a police officer acting in objective good faith, under color of law in the execution of his duties." Crawley, supra, 187 N.J. at 460-61.  In Crawley, we stated

> A police officer who reasonably relies on information from headquarters in responding to an emergency or public safety threat may be said to be acting in good faith under the statute.  However, a police officer who without any basis arbitrarily detains a person on the street would not be acting in good faith.
>
> [Id. at 461 n.8.]

22

A suspect is required to cooperate with the investigating officer even when the legal underpinning of the police-citizen encounter is questionable. See Williams, supra, 192 N.J. at 10 ("[D]efendant was obliged to submit to the investigatory stop, regardless of its constitutionality."); Crawley, supra, 187 N.J. at 459-60 (holding defendant committed obstruction by impeding stop, despite officer's lack of reasonable suspicion).

When Delagarza announced his intention to enter the house, he was doing so in order to lawfully perform an official function under the emergency-aid doctrine. Defendant's attempt to close the door on the officers constituted an attempt to prevent the officers from performing their official function. Defendant's interference is not excused by his suspicions about the officers' intentions. Crawley, supra, 187 N.J. at 459-60, and Williams, supra, 192 N.J. at 10, establish that once an officer makes his investigatory intentions clear, and he is acting under the color of law, the validity of the underlying police action is inconsequential. We hereby confirm that, whether on the street or at a residence, a person who "prevents or attempts to prevent a public servant from lawfully performing an official function by means of . . . physical interference or obstacle" is guilty of obstruction. N.J.S.A. 2C:29-1(a). Because the emergency-aid doctrine justified the officers' warrantless intrusion into defendant's home, and because

defendant hampered their entry by slamming the door, defendant's obstruction conviction should have been upheld.

2.

A person is guilty of third-degree resisting arrest when he or she:

> (a) Uses or threatens to use physical force or violence against the law enforcement officer or another; or
>
> (b) Uses any other means to create a substantial risk of causing physical injury to the public servant or another.
>
> [N.J.S.A. 2C:29-2(a)(3).]

"It is not a defense to a prosecution [for resisting arrest] that the law enforcement officer was acting unlawfully in making the arrest, provided he was acting under color of his official authority and provided the law enforcement officer announces his intention to arrest prior to the resistance." N.J.S.A. 2C:29-2(a); see also Mulvihill, supra, 57 N.J. at 155-56 ("[I]n our State when an officer makes an arrest, legal or illegal, it is the duty of the citizen to submit and, in the event the seizure is illegal, to seek recourse in the courts for the invasion of his right of freedom."). "By the express terms of the [resisting arrest] statute, a person has no right to resist arrest by flight or any other means, even if the arrest constitutes an unreasonable seizure under the constitution." Crawley, supra, 187 N.J. at 453; see also State v. Herrerra, 211

24

N.J. 308, 334-35 (2012) ("It is well-settled that defendants have 'no right' to resist arrest, elude or obstruct the police, or escape 'in response to an unconstitutional stop or detention.'" (quoting Crawley, supra, 187 N.J. at 455)). Because defendant pulled his hands away from the officers after Delagarza announced defendant was under arrest, and in doing so dragged the officers to the floor, the Appellate Division was correct to affirm defendant's resisting arrest conviction.

3.

Defendant contends that his obstruction and resisting arrest convictions should not stand because his actions were justified by the officers' use of excessive force. We acknowledge that a person's use of force against a law enforcement officer may be justified when the officer "employs unlawful force to effect [an] arrest." N.J.S.A. 2C:3-4(b)(1)(a). However, a private citizen may not use force to resist arrest by one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties. Mulvihill, supra, 57 N.J. at 155-56.

As we said previously, the record below supports the findings of the municipal court and Law Division, that the officers announced their intention to arrest, defendant was aware that the officers were in fact police officers, and Officers Hall and Gant each punched the defendant once in the

25

face because they perceived a threat to Delagarza.  Under these circumstances, defendant had a duty to yield to the commands of the officers who were engaged in the performance of their duties.  Ibid.  Therefore, defendant's failure to yield to the officers' legitimate authority resulted in an altercation during which the officers were entitled to use the force the municipal court and Law Division found necessary to subdue defendant.

## V.

The judgment of the Appellate Division is affirmed in part and reversed in part.  Defendant's conviction for resisting arrest is affirmed, and defendant's obstruction conviction is reinstated.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.

SUPREME COURT OF NEW JERSEY

NO.   A-79/80                    SEPTEMBER TERM 2013

ON APPEAL FROM AND CERTIFICATION TO   Appellate Division, Superior Court


STATE OF NEW JERSEY,

        Plaintiff-Respondent
        and Cross-Appellant,

              v.

EVAN REECE,

        Defendant-Appellant
        and Cross-Respondent.


DECIDED         July 20, 2015
              Chief Justice Rabner                    PRESIDING
OPINION BY          Justice Solomon
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |